## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

KING & SPALDING LLP,            )
                                   )
      **Plaintiff,**             )
                                   )
         **v.**               )     **Case No. 16-cv-01616 (APM)**
                                   )
U.S. DEPARTMENT OF HEALTH AND    )
HUMAN SERVICES, et al.,        )
                                   )
      **Defendants.**       )

_____ )

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

This case concerns three Freedom of Information Act ("FOIA") requests submitted by Plaintiff King & Spalding LLP to Defendants U.S. Department of Health and Human Services ("HHS") and U.S. Department of Justice ("DOJ") (collectively "Defendants"). The court already has ruled on one round of summary judgment motions and, at this stage in the litigation, the only remaining issues pertain to the FOIA requests directed to DOJ. Specifically, Plaintiff challenges DOJ's search for responsive records, as well as its withholding of certain documents under Exemptions 6, 7(C), and 7(D).

Before the court are the parties' renewed cross-motions for summary judgment. Upon review of the parties' briefs and the present record, the court grants in part and denies in part Defendants' Renewed Motion for Summary Judgment and Plaintiff's Renewed Cross-Motion for Summary Judgment.

## II.     BACKGROUND

### A.     Plaintiff's FOIA Requests

In 2012, the United States Attorney's Office for the District of Columbia ("USAO-DC") initiated a criminal and civil investigation of Abiomed, Inc., a medical device company. *See* Pl.'s Cross-Mot. for Summ. J., ECF No. 21 [hereinafter Pl.'s Cross-Mot.], Pl.'s Statement of Undisputed Material Facts [hereinafter Pl.'s Stmt.], ¶¶ 36–37.   The investigation centered on marketing and labeling practices for a particular medical device, Impella® 2.5, and ended three years later without any enforcement action.  *See id.*  The investigation may have commenced when an anonymous source, acting through a private lawyer, disclosed records pertaining to Abiomed to the USAO-DC.   *See* Pl.'s Cross-Mot. at 17[1]; *cf.* Defs.' Mot. for Summ. J., ECF No. 20 [hereinafter Defs.' Mot.], Decl. of Tricia Francis, ECF No. 20-2 [hereinafter Francis Decl.], ¶¶ 13–15, 18; Defs.' Combined Opp'n to Cross-Mot. & Reply in Supp. of Mot. for Summ. J., ECF No. 25 [hereinafter Defs.' Initial Reply], Second Decl. of Tricia Francis, ECF No. 25-2 [hereinafter Second Francis Decl.], Corrected & Suppl. *Vaughn* Index for EOUSA, ECF No. 25-2, at 17–26 [hereinafter EOUSA *Vaughn* Index].  Abiomed suspects that one of its competitors, Maquet, is the unnamed source.  *See* Pl.'s Cross-Mot. at 32–33.

After the investigation closed, Abiomed sought to learn about how it started.  On April 14, 2016, counsel for Abiomed, Plaintiff King & Spalding LLP, filed three separate FOIA requests with HHS and two subcomponents of DOJ: the Civil Division and the Executive Office for United States Attorneys ("EOUSA").  *See* Compl., ECF No. 1, ¶¶ 9–11; Defs.' Mot., Defs.' Statement of Material Facts Not in Genuine Dispute [hereinafter Defs.' Stmt.], ¶ 1; Pl.'s Stmt. ¶ 1.  In each

---

[1] Unless otherwise noted, citations to the parties' pleadings, and any exhibits thereto, are to the page numbers electronically generated by CM/ECF.

request, Plaintiff sought documents concerning Abiomed.  *See generally* Defs.' Stmt. ¶¶ 2, 10, 14; Pl.'s Stmt. ¶¶ 2, 10, 14.  Plaintiff asked for "[a]ll documents between January 1, 2012 and October 31, 2012, provided to any [federal agency] from any individual, corporation, partnership, or other private party other than Abiomed, Inc." that "concern[ed], discuss[ed], or refer[red] to Abiomed" or "related . . . to the issuance of a Health Insurance Portability and Accountability Act subpoena issued by the [USAO-DC] to Abiomed."  Defs.' Stmt. ¶¶ 10, 14; *see* Pl.'s Stmt. ¶¶ 10, 14.[2]

As discussed, Plaintiff no longer challenges the response it received from HHS; the only outstanding issues in this matter pertain to the FOIA requests directed to the DOJ Civil Division and the EOUSA.  *See* Joint Status Report, ECF No. 29 [hereinafter JSR], ¶ 3.

### 1.    *Civil Division Request*

The Civil Division responded to Plaintiff's FOIA request by letter dated June 17, 2016. *See* Defs.' Stmt. ¶ 11; Pl.'s Stmt. ¶ 11.  The letter explained that the Civil Division had located 49 pages of potentially responsive documents and had referred those documents to the EOUSA for direct response, but that a portion of the documents were protected from disclosure by court seal. Defs.' Stmt. ¶ 11; Pl.'s Stmt. ¶ 11.  The letter also advised Plaintiff that it could administratively appeal the Civil Division's response within 60 days.  Defs.' Stmt. ¶ 12; Pl.'s Stmt. ¶ 12.

Plaintiff took no action in response to the June 17, 2016, letter that it received from the Civil Division.  Defs.' Stmt. ¶ 13; Pl.'s Stmt. ¶ 13.  According to Plaintiff, it could not have "appealed" the letter because the letter "did not state any determination that the Civil Division was

---

[2] The requests directed to DOJ for documents concerning, discussing, or referring to Abiomed included any documents provided to the Civil Division or the USAO-DC by another federal agency or component or office of DOJ, where that agency, component, or office initially obtained or received the documents from the anonymous source.  *See* Defs.' Stmt. ¶¶ 10, 14; Pl.'s Stmt. ¶¶ 10, 14.

not complying with the FOIA request or any reasons for a decision not to comply" and therefore did not constitute a "final response" from the agency. *See* Pl.'s Stmt. ¶ 13.

On December 23, 2016, from the records it received from the Civil Division, EOUSA released 27 pages in full and withheld 16 pages in full. *See* Defs.' Stmt. ¶ 16; Pl.'s Stmt. ¶¶ 16, 35. According to Defendants, the 16 pages withheld in full are duplicates of documents that EOUSA withheld in full in response to the FOIA request that Plaintiff submitted directly to EOUSA. Defs.' Stmt. ¶ 16; *cf.* Francis Decl. ¶ 11; Francis Decl., Attach. E. Thus, EOUSA withheld those pages on identical grounds as those discussed below. *See* Francis Decl. ¶ 11.

### 2. *EOUSA Request*

Simultaneous with the release of the Civil Division's records, EOUSA responded to the FOIA request directed to it, releasing 344 pages in full and withholding 51 pages in full pursuant to FOIA Exemptions 6, 7(C), and 7(D). Defs.' Stmt. ¶ 15; *see* Pl.'s Stmt. ¶ 15.[3] Thus, all told, EOUSA withheld in full 67 pages of responsive material (51 pages responsive to the EOUSA request and 16 pages responsive to the Civil Division request). *See* Francis Decl., Attachs. D–E. The undisclosed information generally falls into two categories: "(1) the names of government personnel, the name of an attorney representing the unnamed source and the names of third parties who appear in the documents provided by the unnamed source under Exemption[s] [6 and] 7(C), and (2) certain material that could reveal the identity of the Government's unnamed source under Exemption 7(D)." *See King & Spalding, LLP v. U.S. Dep't of Health & Human Servs.*, 270

---

[3] In its December 23, 2016, letter, EOUSA stated that it was also withholding the information pursuant to Exemption 5. *See* Defs.' Stmt. ¶ 15. EOUSA no longer relies on that exemption, however, because it contends that the same information is protected from disclosure under Exemptions 6 and 7. *See id.* at n.1.

F. Supp. 3d 46, 47 (D.D.C. 2017) (cleaned up); *see also* Defs.' Stmt. ¶¶ 15–16; Pl.'s Stmt. ¶¶ 15–16.

On April 5, 2017, after the parties filed their initial cross-motions for summary judgment, EOUSA released four additional documents consisting of email communications, which the agency located after conducting a supplemental search in March 2017. *See* Defs.' Initial Reply at 7, 20; Second Francis Decl. ¶ 3; EOUSA *Vaughn* Index at 23–26 (documents 13–16). As part of this supplemental release, EOUSA released 46 pages in full and 33 pages in part, withholding any information that fell within the two aforementioned categories pursuant to Exemptions 6, 7(C), and 7(D). *See* Second Francis Decl., April 5, 2017 EOUSA Letter, ECF No. 25-2, at 9–11; EOUSA *Vaughn* Index at 23–26.[4] Plaintiff does not appear to challenge any of these redactions. *See* Pl.'s Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 27 [hereinafter Pl.'s Initial Reply], at 5; *see also* Pl.'s Renewed Cross-Mot., ECF No. 33 [hereinafter Pl.'s Renewed Cross-Mot.], at 7 (seeking court order compelling Defendants to produce only those 67 pages of responsive information previously withheld in full).

Separately, as part of the supplemental release, EOUSA also invoked Exemptions 4 and 5 to withhold certain information from several attachments to one of the four produced emails. *See* Defs.' Initial Reply at 21 (noting the withholding of attachments to an email labeled document 13, which included the U.S. Food and Drug Administration's ("FDA") internal draft minutes of a meeting between Abiomed and FDA's Office of Compliance and proposed edits to those minutes,

---

[4] Specifically, the redacted information included: the names and identifying information of DOJ attorneys, a criminal investigator for the U.S. Food and Drug Administration ("FDA"), the name of counsel for the unnamed source, and passcode information for a telephonic conference. *See* Defs.' Initial Reply at 20; *see also* Second Francis Decl. ¶¶ 3–11; Second Francis Decl., Decl. of Sarah Kotler, ECF No. 25-2, at 12–16 [hereinafter Kotler Decl.], ¶ 11; EOUSA *Vaughn* Index at 23–26. Additionally, the FDA identified Exemption 7(F) as a separate basis to withhold the name of its criminal investigator. Kotler Decl. ¶ 11. That exemption is not listed in the EOUSA *Vaughn* Index, however, and Defendants do not appear to rely on that exemption in their briefing. *Cf.* Defs.' Initial Reply at 20 n.7 (stating only that Exemption 7(F) was identified as an additional basis for withholding the name of the FDA investigator).

as well as an inspection report of Abiomed); *see also* Second Francis Decl. ¶ 10; Second Francis

Decl., Decl. of Sarah Kotler, ECF No. 25-2, at 12–16 [hereinafter Kotler Decl.], ¶¶ 6–9; EOUSA

*Vaughn* Index at 23–24 (document 13). In its first cross-motion for summary judgment, Plaintiff

explained that it did not challenge the applicability of Exemptions 4 and 5, provided that Plaintiff

was correct in its understanding that "the government is asserting Exemption 4 to protect

confidential commercial information supplied by Abiomed to the government, and Exemption 5

to protect internal notes made by government lawyers that memorialize meetings held between

Abiomed and the government." Pl.'s Initial Reply at 17. Plaintiff reiterated this point in a Joint

Status Report filed after the court denied both sides' initial cross-motions for summary judgment

and asked Defendants to define the scope of the material withheld. *See* JSR ¶ 18. Defendants did

not provide the requested clarification in their present motion for summary judgment, *see* Defs.'

Renewed Mot. for Summ. J., ECF No. 32, Mem. in Supp. [hereinafter Defs.' Renewed Mot.], at

4, but Plaintiff did not press the issue further in its renewed cross-motion, *see generally* Pl.'s

Renewed Cross-Mot. (incorporating by reference all previous arguments raised in initial briefing

filed in support of summary judgment but failing to mention Exemptions 4 and 5). As the parties

have not fully briefed the Exemption 4 and 5 withholdings, the court does not address them here.

Instead, as directed below, the parties shall meet and confer regarding the scope of information

withheld pursuant to Exemptions 4 and 5 and clarify whether Plaintiff intends to challenge those

withholdings.

### B.    Procedural Background

Plaintiff brought this FOIA action on August 9, 2016, *see* Compl., and the parties filed

cross-motions for summary judgment on February 7, 2017, and February 28, 2017, respectively,

*see* Defs.' Mot.; Pl.'s Cross-Mot. In their initial cross-motions, the parties disputed, among other

things: (1) Plaintiff's exhaustion of administrative remedies with respect to the Civil Division request, (2) the adequacy of EOUSA's search, (3) the applicability of FOIA Exemptions 6, 7(C), and 7(D) to the information withheld in response to both the Civil Division and EOUSA requests, and (4) EOUSA's segregability determination. *See* Defs.' Mot. at 15–28; Pl.'s Cross-Mot. at 24–44.

On September 6, 2017, the court denied the parties' motions without prejudice. *See generally King & Spalding, LLP*, 270 F. Supp. 3d at 47–49. In doing so, the court only addressed a threshold question raised by the parties' dispute over the applicability of Exemptions 7(C) and 7(D): whether the source of the withheld records is an entity or an individual. *See id.* The court observed that, as to Exemption 7(C), if the source is an entity, "then the materials the entity supplied [could not] be withheld . . . based solely on the company's interest in nondisclosure," because "the protection of personal privacy under Exemption 7(C) does not extend to corporations." *Id.* at 48 (internal quotation marks omitted). Similarly, the court noted that the identity of the source impacted the Exemption 7(D) calculus, which requires the Government "to present probative evidence that the source provided information . . . under either an express or implied assurance that its identity would remain confidential," because an implied assurance of confidentiality may be more difficult to establish where the source is entity. *See id.* at 48–49 (internal quotation marks omitted). Accordingly, the court denied the parties' initial cross-motions for summary judgment without prejudice, allowing Defendants to submit additional information concerning the source's identity. *Id.*

On September 22, 2017, Defendants advised the court that they had no more information to offer about the identity of the confidential source. *See generally* JSR. Defendants reported that, "[b]ecause the source was not identified by the attorney who provided the material on the source's

behalf, EOUSA does not know whether the source was an entity or an individual." *See id.* ¶ 5. Nevertheless, Defendants indicated that they intended to renew their motion for summary judgment with respect to their withholdings under Exemptions 6, 7(C), and 7(D), subject to one exception discussed below. *See id.* ¶¶ 7–9.

The parties renewed their cross-motions for summary judgment on November 2, 2017, and November 17, 2017, respectively. *See generally* Defs.' Renewed Mot.; Pl.'s Renewed Cross-Mot. In their renewed motions, both parties incorporate their previous arguments with respect to segregability, adequacy of the search, and exhaustion. *See* Defs.' Renewed Mot. at 4; Pl.'s Renewed Cross-Mot. at 19–21. The parties also advance similar arguments concerning the applicability of Exemptions 6, 7(C), and 7(D). *See* Defs.' Renewed Mot. at 5–15; Pl.'s Renewed Cross-Mot. at 9–19. Defendants qualify their earlier position in one respect, however. Because EOUSA does not know whether the source was an entity or an individual—and, correspondingly, does not know whether the source has a legally cognizable privacy interest—Defendants no longer rely on Exemptions 6 and 7(C) as independent bases to justify the complete withholding of records to protect the source's identity. *See* Defs.' Renewed Mot. at 13. But Defendants do continue to rely on Exemptions 6 and 7(C) to withhold the names and other identifying information of government personnel and third parties, including the private attorney who communicated with the Government on the source's behalf. *See id.* at 13–15.

Plaintiff, for its part, contends that Defendants cannot meet their burden to justify application of Exemption 7(D) in this case, largely for the same reasons stated in Plaintiff's initial motion for summary judgment. *Cf.* Pl.'s Renewed Cross-Mot. at 7–8, 10–18. Plaintiff also takes issue with Defendants' continued reliance on Exemptions 6 and 7(C) to withhold the name of the private attorney who represented the source, as well as the name of his or her law firm. *See id.* at

18–19.  Plaintiff is silent, however, as to Defendants' continued reliance on those exemptions to withhold the names of government personnel and third parties whose names may appear in the responsive records.  *See id.*; Pl.'s Reply in Supp. of Renewed Cross-Mot. for Summ. J., ECF No. 37 [hereinafter Pl.'s Reply], at 9–10; *see also* Pl.'s Cross-Mot. at 24–33 (failing to address Defendants' explanation for withholding the names and identifying information of these individuals in initial round of summary judgment briefing).

The parties' renewed cross-motions for summary judgment are now ripe for consideration.

## III.    LEGAL STANDARD

"Designed to facilitate public access to Government documents, [FOIA] requires federal agencies to disclose information to the public upon reasonable request unless the records at issue fall within specifically delineated exemptions."  *Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 401 (D.C. Cir. 2017) (cleaned up).  To prevail in a FOIA action, an agency must demonstrate that three requirements are met.  *See Sea Shepherd Conservation Soc'y v. IRS ("Sea Shepherd I")*, 89 F. Supp. 3d 81, 89–90 (D.D.C. 2015).  First, the agency must "'demonstrate the . . . adequacy of the search' for relevant documents."  *Cable News Network, Inc. v. FBI*, 293 F. Supp. 3d 59, 68 (D.D.C. 2018) (alteration in original) (quoting *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982)).  "Second, it must show that the withheld material 'falls within one of nine statutory exemptions.'"  *Id.* (quoting *People for the Ethical Treatment of Animals v. Nat'l Institutes of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014)).  Finally, "[e]ven when an exemption applies, the agency is obligated to disclose '[a]ny reasonably segregable portion of a record' after removing the exempt material."  *Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 62 (D.C. Cir. 2018) (second alteration in original) (quoting 5 U.S.C. § 552(b)).

Most FOIA cases are appropriately resolved on motions for summary judgment. *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a fact is "material" only if it is capable of affecting the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)). "The agency may carry that burden by submitting affidavits that 'describe the justification for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice ("CREW")*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)); *see also SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (imposing similar burden on agency to establish adequacy of search and explaining that agency affidavits must be "relatively detailed and non-conclusory" and "submitted in good faith" (internal quotation marks omitted)).

## IV.    DISCUSSION

The parties' renewed cross-motions for summary judgment present four issues: (1) whether EOUSA properly withheld responsive records pursuant to FOIA Exemptions 6, 7(C), and 7(D);

(2) whether EOUSA adequately justified its efforts to segregate and release all non-exempt records; (3) whether Plaintiff was required to exhaust its administrative remedies with respect to the request directed to the DOJ Civil Division; and (4) whether EOUSA conducted an adequate search for responsive records.  The court addresses each of these issues in turn.

### A.     FOIA Exemptions

Because Defendants invoke Exemption 7(D) to withhold *in full* the 67 pages of responsive information that Plaintiff seeks, the court begins its analysis with that exemption before addressing whether Defendants may rely on Exemptions 6 and 7(C) to withhold the identity of the lawyer and law firm that represented the source.

#### 1.     *Exemption 7(D)*

The 67 pages of responsive information withheld in full by EOUSA "were provided to the [USAO-DC] by a private attorney who represented an unidentified source in connection with an investigation by that Office into alleged criminal conduct by Abiomed."  Defs.' Renewed Mot. at 6 (citing Francis Decl. ¶ 18); *accord* Second Francis Decl. ¶¶ 2, 9.  EOUSA contends that this information is protected from disclosure under Exemption 7(D) because its release "could reasonably be [expected] to disclose the identity of the [unidentified] source, who provided material on a confidential basis."  EOUSA *Vaughn* Index at 17–23 (documents 1–12); *accord* Francis Decl. ¶ 19.

Exemption 7(D) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to disclose the identity of a confidential source," and, "in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation . . . information furnished by [the] source."   5 U.S.C.

§ 552(b)(7)(D). There is no dispute that the documents at issue here were "compiled for law enforcement purposes." *See* Francis Decl. ¶ 14 ("All information at issue in this case was compiled for law enforcement purposes in order to investigate allegations of criminal conduct by Abiomed."); *cf.* Pl.'s Renewed Cross-Mot. at 10. Instead, the parties contest whether the anonymous source qualifies as a "confidential source" within the meaning of Exemption 7(D)— that is, whether the source provided the information in question "with an understanding that the communication would remain confidential," *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993). *See* Defs.' Renewed Mot. at 5–11; Pl.'s Renewed Cross-Mot. at 10–15.

"A source counts as confidential 'if the source provided information under an express assurance of confidentiality or in circumstances from which such assurance could reasonably be inferred.'" *Labow v. U.S. Dep't of Justice*, 831 F.3d 523, 530 (D.C. Cir. 2016) (quoting *Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995)); *accord Landano*, 508 U.S. at 172. "[I]t is 'not enough for the agency to claim that all sources providing information in the course of a criminal investigation do so on a confidential basis.'" *Borda v. U.S. Dep't of Justice*, 245 F. Supp. 3d 52, 60 (D.D.C. 2017) (quoting *Labow*, 831 F.3d at 531). Rather, the agency must "either 'present probative evidence that the source did in fact receive an express grant of confidentiality,' or 'point to more narrowly defined circumstances that support the inference of confidentiality.'" *CREW*, 746 F.3d at 1101 (citations and alteration omitted) (first quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 34 (D.C. Cir. 1998); then quoting *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1184 (D.C. Cir. 2011)). "The agency invoking Exemption 7(D) bears the burden of 'showing that the

source is a confidential one.'"  *Sea Shepherd I*, 89 F. Supp. 3d at 97 (quoting *CREW*, 746 F.3d at 1101).

In this case, Defendants do not contend that the anonymous source furnished the information based on an express assurance of confidentiality.  Rather, they maintain that the source did so under "more narrowly defined circumstances" that support an implied assurance of confidentiality.  Defs.' Mot. at 26; Defs.' Renewed Mot. at 5–11; *see Landano*, 508 U.S. at 179. Following *Landano*, the D.C. Circuit has identified four factors, originating in the case of *Roth v. U.S. Department of Justice*, that courts should consider when deciding whether a source received an implied assurance of confidentiality: "[1] the character of the crime at issue, [2] the source's relation to the crime, [3] whether the source received payment, and [4] whether the source has an ongoing relationship with the law enforcement agency and typically communicates with the agency only at locations and under conditions which assure the contact will not be noticed." *Labow*, 831 F.3d at 531 (quoting *Roth*, 642 F.3d at 1184).  No single factor is dispositive.  *See id.* at 531–32.

Before turning to the individual factors, the court notes the general lack of evidence offered by Defendants to support their invocation of Exemption 7(D)—even after the court gave Defendants a second bite at the apple.  Defendants' declarant Tricia Francis, an Attorney Advisor with the EOUSA, provides little context for the anonymous source's disclosure.  She does not say, for instance, how the lawyer first contacted the USAO-DC; what the lawyer told the assigned AUSA about his or her client; or what words passed between the lawyer and the AUSA about the document disclosure.  *See generally* Francis Decl.; Second Francis Decl.  Nor can the court tell much about the withheld records from the limited descriptions contained in the *Vaughn* Index. The court does not know, for example, whether the records contain trade secrets, proprietary

information, or other sensitive data; whether the documents refer to individuals obviously associated with the source; or whether the documents bear any kind of confidentiality markings. *See generally* EOUSA *Vaughn* Index. Notably, Defendants did not submit any evidence or the documents themselves for in camera consideration. Thus, in terms of details, the court is left wanting.

In large part, Francis's declaration contains unhelpful generalities. Francis reports that it is her "*understanding* . . . that the AUSA did not know the identity of the source on whose behalf private counsel provided information that supported the Government's investigation of Abiomed." Second Francis Decl. ¶ 9 (emphasis added). She also submits that the information provided "could reasonably reveal the identity of the source" if released, given that it "*appears to be* of a type accessible to a finite group of people and/or attributable to a specific person or group of people." *Id.* (emphasis added). Francis adds that "the fact that the source's identity remained anonymous supports the notion that the source wished to provide the government with information in support of its investigation in a confidential manner." *Id.*

Francis's statements are more notable for what they do *not* say, than what they do say. Francis does not specify whether her "understanding" is based on communications with the AUSA who received the records or some other source; explain why the records "appear[ ] to be" of a type to which only a small group would have access; nor discuss in what other ways the release of the information might reveal the source. Moreover, while the source's anonymity and the decision to speak through counsel bear some weight, "anonymity primarily shows that a source wants to remain confidential rather than that there was any assurance that the source would be treated as confidential." *Ortiz v. U.S. Dep't of Health & Human Servs.*, 70 F.3d 729, 734 (2d Cir. 1995); *see also Sea Shepherd I*, 89 F. Supp. 3d at 98 (rejecting confidential-source treatment based merely on

a request for anonymity). Finally, the court is perplexed by Francis's assertion that although "the AUSA did not know the identity of the source," disclosing the records still "could reasonably reveal" the source's identity. *See* Second Francis Decl. ¶ 9. If the AUSA could not decipher the source despite the benefit of compulsory process and access to nonpublic information, then why should the court believe that Plaintiff, who lacks those advantages, is more capable of ferreting out the source?

In any event, the court now turns to the four *Roth* factors.

### a. Character of the crime

The first factor—the nature of the crime investigated—"contemplates that sources likely expect confidentiality when they report on serious or violent crimes, risking retaliation." *See Labow*, 831 F.3d at 531. Thus, in some cases, "the *violent* nature of the crime at issue" will "'characteristically support[ ] an inference of confidentiality' that a court can generically apply to all informants." *Rosenberg v. U.S. Dep't of Immigration & Customs Enf't*, 13 F. Supp. 3d 92, 110 (D.D.C. 2014) (emphasis added) (quoting *Landano*, 508 U.S. at 177); *see, e.g.*, *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1330 (D.C. Cir. 2000) ("[W]hatever his 'relation to the crime,' an informant is at risk to the extent the criminal enterprise he exposes is of a type inclined toward violent retaliation."); *see also Hodge v. FBI*, 703 F.3d 575, 581 (D.C. Cir. 2013) (holding that the character of the crime may support an inference of confidentiality, "particularly if the criminal activity is of a type inclined toward violent retaliation" (internal quotation marks omitted)).

This is not such a case. Here, the unidentified source provided information that "led to a federal criminal investigation into whether Abiomed was engaged in off-labeling marketing practices, i.e., promoting [medical devices] for uses outside of those approved by the [FDA]." *King & Spalding, LLP*, 270 F. Supp. 3d at 47; *see* Defs.' Renewed Mot. at 9; Francis Decl. ¶¶ 13,

15; *cf.* Pl.'s Stmt. ¶¶ 36–44.   The regulatory nature of the offense for which Abiomed was investigated therefore distinguishes this case from those where courts have found "the violence and risk of retaliation that attend [a particular] type of crime [to] warrant an implied grant of confidentiality for . . . a source." *See Mays*, 234 F.3d at 1329; *see also Rosenberg*, 13 F. Supp. 3d at 110 (listing the types of cases in which the violent nature of the crime supports an inference of implied confidentiality, including "homicide, drug trafficking, gang-related crime, terrorism, or government overthrow"); *Hodge*, 703 F.3d at 581–82 (finding implied assurance of confidentiality given "vicious nature of the crimes" and declarant's statement that disclosure of witness identities could subject witnesses to "violent reprisals"); *cf. Sea Shepherd Conservation Soc'y v. IRS ("Sea Shepherd II")*, 208 F. Supp. 3d 58, 84 (D.D.C. 2016) (noting that while the agency's law enforcement function related to tax offenses, the first factor still favored implied confidentiality where "the nature of the information provided related to other more physically threatening crimes" and the agency provided evidence that at least one source indicated a fear of retaliation, "which [was] unsurprising, given [the target's] well-documented history of violence against its ideological opponents").

Nor does the seriousness of the offense weigh in favor of a finding of an implied assurance of confidentiality here.   While Defendants are correct that application of Exemption 7(D) "is not limited to situations involving violent crimes," Defs.' Renewed Mot. at 9, the only case Defendants cite from this jurisdiction is easily distinguishable.   In that case, the plaintiff submitted FOIA requests to various federal agencies, including the FBI, seeking records related to the raid of a meatpacking plant and the subsequent prosecution of the plant's manager, whom the plaintiff represented.   *See Rosenberg*, 13 F. Supp. 3d at 98.   After reviewing in camera the information withheld by the FBI pursuant to Exemption 7(D), the court concluded that the FBI had "met its

burden of establishing that the individuals whose identities and information [were] withheld [had] provided information to the FBI under an implied assurance of confidentiality." *Id.* at 110. In so holding, the court reasoned that while the case did not involve a violent crime that otherwise might characteristically support an inference of confidentiality, the "severity" of the financial crimes at issue in that case and the "close association" that certain informants had with the plant, its manager, or the manager's fraudulent activity supported the requisite inference. *Id.* As relevant here, the court explained:

> [A]s the FBI averred in its . . . Declaration, these informants provided information about a financial fraud perpetrated by [the plant manager] that resulted in his incarceration in federal prison for a term of twenty-seven years. While the length of the incarceration or even the potential for incarceration was unknown to the informants at the time they provided information to the FBI, [the manager's] lengthy sentence reflects the severity of the crime about which the informants were providing information. Indeed, [the manager] was convicted of 86 counts of financial fraud and related offenses. . . . Courts have found informants to have spoken under implied assurances of confidentiality when they provided information about similarly severe non-violent financial crimes, for example, an investigation into a suspect who had committed crimes of "racketeering activity, wire fraud, money laundering, loan sharking, extortion, obstruction of justice, aiding and abetting, securities fraud, and embezzling funds from a labor organization."

*Id.* at 110–11 (citations omitted) (quoting *Wolfson v. United States*, 672 F. Supp. 2d 20, 33 (D.D.C. 2009)). Suffice it to say, in terms of severity, the character of the alleged crimes at issue here— involving violations of laws relating to the promotion of off-label use of a medical device—pales in comparison to the character of the crimes at issue in *Rosenberg*, which involved "long term incarceration and financial fraud," 13 F. Supp. 3d at 109 (alterations omitted).[5]

---

[5] Neither party offers much detail about the nature of the criminal and civil investigation initiated, and eventually dropped, by the USAO-DC, other than to say that the investigation focused on alleged off-label promotion of one of Abiomed's medical devices. Nevertheless, the court notes that even the harshest penalties for such conduct appear to be far less severe than the potential punishment for the crimes cited in *Rosenberg*. *Compare* 21 U.S.C. § 331 (prohibiting adulteration or misbranding of devices), *and* 21 U.S.C. § 333(a) (describing criminal penalties for

Importantly, Francis's assessment of the risks faced by the source who provided the withheld materials does not lead the court to a different conclusion. The Supreme Court's reasoning in *Landano* suggests that the first two factors (the nature of the crime and the source's relation to it) are merely a proxy for determining the potential risk of retaliation faced by the source if her identity were disclosed. *See* 508 U.S. at 179–80. Thus, in analyzing the first factor, courts also have considered any other evidence relevant to the nature of that risk. *See, e.g.*, *Labow*, 831 F.3d at 531 (considering agency declarant's explanation of potential risk in assessing first factor); *Sea Shepherd II*, 208 F. Supp. 3d at 84 (same); *see also Hale v. U.S. Dep't of Justice*, 99 F.3d 1025, 1030 (10th Cir. 1996) (noting that *Landano* identified several factors relevant to the implied confidentiality inquiry and that under the rationale articulated in that case, "courts may look to the risks an informant might face were her identity disclosed, such as retaliation, reprisal or harassment, in inferring confidentiality" (quoting *Massey v. FBI*, 3 F.3d 620, 623 (2d Cir. 1993)).

Here, the only such evidence offered by Defendants is Francis's statement that Exemption 7(D) protects from disclosure the identity of and information provided by the confidential source, because the release of such information "would endanger individual informants, likely making them targets of harassment or other forms of reprisal." Francis Decl. ¶ 18; Second Francis Decl. ¶ 8. But there are several problems with this statement, at least as applied to this case. First, Francis's prediction about the aforementioned risks is premised on pure speculation. By Francis's own admission, EOUSA does not know whether the source is an individual or an entity. *See* Francis Decl. ¶ 18; Second Francis Decl. ¶ 9. That great unknown is, at minimum, a relevant consideration in assessing risk to the source. *See Landano*, 508 U.S. at 176.

---

violation of section 331), *with* 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), *and* 18 U.S.C. § 1014 (false statements to bank).

Second, Francis's risk assessment is too conclusory. *See generally CREW*, 746 F.3d at 1088, 1100 (explaining that an agency affidavit generally must contain "reasonably specific detail" to carry the agency's burden of establishing that a claimed exemption applies). While the D.C. Circuit "ha[s] credited the FBI's assessment of risks faced by informants even if described in relatively broad strokes," *Labow*, 831 F.3d at 531, it has only done so where inferences about those risks "can reasonably be drawn *from the type of crime committed*," *id.* (emphasis added). *Compare id.* (finding FBI explanation concerning risks associated with informing on anarchist groups—such as "embarrassment, humiliation, and/or physical or mental harm" and "retaliation and threats (including death threats)"—to be sufficient, even though it spoke to potential dangers posed by anarchist extremists in general, because the cited risks could be reasonably inferred from nature of crime), *with Comput. Prof'ls for Soc. Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 906 (D.C. Cir. 1996) (rejecting agency's suggestion that sources of information relating to "computer crimes" face the same potential for harassment or retaliation as sources of information relating to gang-related crimes where agency "offered no evidence that a fear of retaliation by hackers [was] sufficiently widespread" to justify inference that sources of information relating to computer crimes expected confidentiality). No such inference can be drawn here. *Cf. Hodge*, 703 F.3d at 581–82 (crediting agency assessment that disclosure of identities of witnesses who provided information about FOIA requester's involvement in murder could have "disastrous consequences" and subject informants to "violent reprisals"); *Petrucelli v. Dep't of Justice*, 51 F. Supp. 3d 142, 170 (D.D.C. 2014) (holding that agency properly invoked Exemption 7(D) where declarant not only stated that disclosure would render informants "targets of harassment or other forms of reprisal," as here, but also offered further details, including the fact that the source provided

information about a violent criminal enterprise and that the FOIA requester was convicted of a "revenge killing" in connection with that enterprise).

Defendants attempt to provide a slightly more detailed explanation about the potential risks of disclosure in their briefs, but the court finds that explanation equally unconvincing. Specifically, Defendants argue that based on Plaintiff's representations in this lawsuit, it is reasonable to infer that Plaintiff "intends to use the information sought in [its] FOIA [requests] to attempt to identify the anonymous source and possibly pursue that source in some fashion," thereby supporting the inference that "the anonymous source provided the information under circumstances that implied an assurance of confidentiality." Defs.' Renewed Mot. at 10 (citing *Ortiz*, 70 F.3d at 735). *But see* Pl.'s Renewed Cross-Mot. at 14 ("[Plaintiff] has never suggested that it plans any particular action against the unidentified source or its counsel. After all, [Plaintiff] does not know who the source was or the actual nature of the information that was provided."). Defendants do not predict how Plaintiff would intend to "pursue the source," but perhaps Defendants intend to suggest that the threat is "possible legal action." *See Landano*, 508 U.S. at 176. Yet even if that were the case, under *Landano*, the court cannot conclude that such a risk weighs in favor of implied confidentiality absent more information about the nature of information provided and the source itself. *See id.*; *cf. EPIC v. Drug Enf't Admin.*, 192 F. Supp. 3d 92, 111 (D.D.C. 2016) (holding that "potential retaliation against a private company" was insufficient to establish an implied assurance of confidentiality absent a more detailed explanation of the other *Roth* factors).

Thus, the court finds that the first factor does not tip the scales in favor of a finding of implied confidentiality here.

b.       Source's relation to crime

The court turns next to the second *Roth* factor: the source's relationship to the crime.  This factor is relevant to the implied confidentiality analysis "because sources divulging nonpublic, identifying information are more 'vulnerable to retaliation.'"  *Labow*, 831 F.3d at 531 (quoting *Mays*, 234 F.3d at 1330).  As discussed, EOUSA does not know the identity of the source who provided information to the USAO-DC in support of its investigation of Abiomed.  Presumably for this reason, Francis's declarations are silent with respect to the source's relationship to Abiomed or its marketing practices that were the subject of the investigation.  Instead, Francis simply states that the information provided by the source "could reasonably reveal [its] identity . . . to Plaintiff, or others, given that the information provided appears to be of a type accessible to a finite group of people and/or attributable to a specific person or group of people." Second Francis Decl. ¶ 9; *see also* Francis Decl. ¶ 19 (noting that Defendants only withheld records that did not appear "on their face . . . to be publicly available or subject to wide dissemination").

In its most recent application of the *Roth* factors, the D.C. Circuit found the second factor to weigh in favor of implied confidentiality when the informants were "in a position to have ready access to and/or knowledge about targets and others involved" in the investigated activity and "provided specific detailed information that [was] *singular in nature*."  *Labow*, 831 F.3d at 532 (emphasis added).  Such information, the *Labow* court reasoned, was the kind that "could be traced to a particular source" if released to the public.  *Id.*  In some sense, Francis's statement that the information appears to be accessible to a finite group of people and/or attributable to a specific person or group of people is similar to the agency explanation offered in *Labow*.  But absent more facts, the court is in no position to evaluate the validity of that claim or the proximity of the source

to the crime.  Most obviously, the court cannot make the assessment because Defendants do not

know the character of the source.  If, for instance, the source is an Abiomed competitor, then that

fact might weigh against an inference of confidentiality.  The opposite would hold true if the source

is an Abiomed insider.

Nor do the documents, as described in the *Vaughn* Index, lead to the natural inference that

they were closely held.  Several of the withheld documents are identified as letters between

Abiomed and the FDA.  *See* EOUSA *Vaughn* Index at 18–20 (documents 3–5).  Presumably, these

letters would be publicly available under FOIA.  Other records are described as "bate[s]-stamped,"

but not by the EOUSA.  *See id.* at 20 (document 6).  Bates-stamp markings suggest that these

documents may have been exchanged in civil litigation or produced to a government agency.  And,

finally, two of the documents are described as a "two-page article regarding an Abiomed product,

which contains markings by an unidentified person," *id.* at 21 (document 7), and a "note from a

third party to unidentified recipients," *id.* (document 8).  The lack of identifying information about

the author of the markings and the note means that the court cannot draw any inference at all from

these documents about the source's proximity to the alleged unlawful activity.  In short, these

records are a far cry from the type of records that courts have recognized give rise to an inference

of confidentiality by virtue of their content.  *Cf. Ortiz*, 70 F.3d at 734 (finding it reasonable to

assume close relationship between target of investigation and source based on nature of allegations

and contents of an anonymous letter, which demonstrated source's awareness of personal details

of target's life).  The court therefore finds this factor to be, at most, neutral.

c.      Whether the source received payment

Moving on to the third *Roth* factor, the court's analysis is easy:  Given that Defendants

presented no evidence with respect to whether the unidentified source received payment in this

case, the third factor does not weigh in favor of a finding of implied confidentiality here. *Cf. Landano*, 508 U.S. at 179 ("[I]t is reasonable to infer that paid informants normally expect their cooperation with the FBI to be kept confidential."); *Labow*, 831 F.3d at 532 ("[A]ll parties agree that the sources did not receive payment. That fact weighs against a finding of confidentiality, but is not itself dispositive.").

      d.     <u>Duration of relationship with law enforcement and manner of communication</u>

That leaves the fourth *Roth* factor, which "concerns the duration of the source's relationship with law enforcement and the manner of communication." *Labow*, 831 F.3d at 532; *see also Roth*, 642 F.3d at 1184 (describing fourth factor as "whether the source has an 'ongoing relationship' with the law enforcement agency and typically communicates with the agency 'only at locations and under conditions which assure the contact will not be noticed.'" (quoting *Landano*, 508 U.S. at 179)). In this case, Defendants make no argument about the duration of the source's relationship with law enforcement. They appear only to rely upon the second criteria—the manner of communication—to support an inference of confidentiality. *See* Defs.' Renewed Mot. at 8–9. Defendants contend that "[t]he fact that the source remained anonymous and provided the information through a conduit (an attorney at a private law firm)" supports the application of Exemption 7(D) here. *Id.* at 8 (citing *Ortiz*, 70 F.3d at 734; and *Providence Journal Co. v. U.S. Dep't of Army*, 981 F.2d 552, 566 (1st Cir. 1992)).

As noted previously, the court agrees that the anonymous production of records does support *some* inference of confidentiality. *Cf. Labow*, 831 F.3d at 532 ("Consistent and *secretive* communications indicate a source's expectation of confidentiality." (emphasis added)). But on this record, the utter lack of specific evidence makes that inference a relatively weak one. The declarant, Francis, tells the court no more than that an unidentified source, acting through a private

lawyer, provided the documents to law enforcement. *See* Francis Decl. ¶ 18. The EOUSA *Vaughn* Index provides a bit more color. It suggests that some communication took place by email in February 2012. *See* EOUSA *Vaughn* Index at 22 (document 11). The next dated entries are from May 2012 and are contained in a letter from the lawyer to an AUSA, which encloses documents, *see id.* at 17 (document 1), and two additional email communications, *see id.* at 21–22 (documents 9–10). These limited communications, seemingly occurring over a short period of time at the start of the investigation, do not support an "ongoing relationship" with the law enforcement agency. Notably, there appear to be no communications in the later part of the three-year investigation. Nor do the communications themselves give rise to a particularly strong inference of confidentiality, as Defendants claim. True the source remained anonymous, but its lawyer did not; instead, the lawyer chose to communicate via traditional methods of letter and email, not in a manner suggesting a need for greater secrecy (such as an in-person meeting). Thus, the fourth *Roth* factor does not tilt the scales in favor of nondisclosure.

The two primary cases on which Defendants rely—*Ortiz* and *Providence Journal*, both involving anonymous sources—do not compel a different result. *Ortiz* involved an unsolicited, anonymous letter sent to a field office of the Social Security Administration, which triggered a criminal investigation of the plaintiff. *See* 70 F.3d at 733–34. After reviewing the letter in camera, the Second Circuit concluded that the letter, even though unsolicited, was sent with an assurance of confidentiality that reasonably could be inferred from the circumstances. *Id.* Specifically, the court found it "evident from the nature of the allegations and the contents of the letter that the author was aware of personal details of [the plaintiff's] life." *Id.* at 734. Thus, the court held:

> It is reasonable to assume that knowledge of such details places the source of that information in close relationship with, or proximity to, [the plaintiff]. . . . The possibility of retaliation or harassment is reasonable and genuine in a case such as this one where serious

> allegations are made by someone who may be quite close to the
> object of those allegations.

*Id. Providence Journal* is factually similar to *Ortiz*. There, the Inspector General of the Army received four anonymous letters accusing officers of the Rhode Island National Guard of serious misconduct punishable either by disciplinary action or court-martial under the Uniform Code of Military Justice. *See Providence Journal*, 981 F.2d at 555. The court found the authors of the letters to be anonymous sources who had sent the letters in confidence, in part because of the consequential nature of the allegations and because two of the letters contained "explicit representations that the writers feared 'reprisal' or 'retribution' (*e.g.,* loss of employment) in the event their statements were disclosed." *Id.* at 565–67.

To state the obvious, other than the anonymity of the source, this case bears little resemblance to *Ortiz* or *Providence Journal*. As discussed, because Defendants have not identified the source as an entity or an individual, the court cannot assess the risks that disclosure would pose. Moreover, the court does not know enough about the documents' contents to find that they contain the type of intimate or closely-held information that might reveal the source. And, finally, the fact the source used a private lawyer to convey the records means the source is likely more sophisticated than the letter writers in *Ortiz* and *Providence Journal* and thus less likely to believe that mere anonymity equates to confidentiality. Indeed, by using private counsel, it is fair to assume that the source was on notice of the "boundaries of the FOIA exemptions," *Brant Constr. Co. v. EPA*, 778 F.2d 1258, 1262–63 (7th Cir. 1985), and therefore capable of taking the proper steps to ensure confidentiality, if so desired. Accordingly, *Ortiz* and *Providence Journal* do not aid Defendants' cause.

*     *     *

In summary, weighing the four *Roth* factors together, the court cannot conclude that the unidentified source provided the information in question to the USAO-DC under an implied assurance of confidentiality. Although the source remained anonymous and provided some potentially nonpublic and identifying information through counsel, *see* Francis Decl. ¶¶ 18–19, the lack of other information about the source, including its proximity to the alleged misconduct, neutralizes those factors. Moreover, because the misconduct in question concerns off-label marketing practices, not more serious or violent crimes, it is less likely that the source feared retaliation and thus expected confidentiality, as opposed to simply wanting to remain anonymous. Thus, under these circumstances, the court finds that Defendants have failed to justify their invocation of Exemption 7(D) to withhold the 67 pages of responsive information in full.[6]

### 2. Exemptions 6 and 7(C)

The court turns next to Defendants' invocation of Exemptions 6 and 7(C) to withhold the name of the lawyer and the law firm that represented the source.[7] Because "'Exemption 7(C) is

---

[6] Because the court concludes that the unidentified source does not qualify as a "confidential source" within the meaning of Exemption 7(D), the court need not address the parties' arguments with respect to (1) whether disclosure of the information provided by the source "could reasonably be expected to" reveal the source's identity, *see* Defs.' Renewed Mot. at 9; Pl.'s Renewed Mot. at 9–10, and (2) whether disclosure of the same information is nevertheless protected under the second clause of the exemption, which protects information furnished by confidential sources if such information is compiled by criminal law enforcement authority "in the course of a criminal investigation," *see* Defs.' Renewed Mot. at 10; Pl.'s Renewed Mot. at 10–12. For the same reason, the court does not reach Defendants' asserted separate basis for withholding information identifying the private attorney who communicated on behalf of the source under Exemption 7(D). *See* Defs.' Renewed Mot. at 9 (arguing that "Exemption 7(D) also protects information identifying the agent who provided the information on behalf of the unidentified [confidential] source when the agent's identity could be used to identify the informant" (internal quotation marks omitted)).

[7] As discussed above, Plaintiff does not appear to challenge Defendants' reliance on Exemptions 6 and 7(C) to withhold the names and other identifying information of government personnel or third parties whose names may have appeared in either the 67 pages withheld in full by EOUSA or the 33 pages released in part as part of EOUSA's supplemental release. However, because those individuals clearly have a privacy interest in not having their names associated with a law enforcement investigation, *see Bartko*, 898 F.3d at 71; *see also Roth*, 642 F.3d at 1174 ("[W]itnesses, informants, and investigating agents have a substantial interest in ensuring that their relationship to the investigations remains secret." (cleaned up)), Plaintiff, as the requester, bore the burden of showing how disclosure of these individuals' names would likely advance a significant public interest, *see Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). For the same reasons discussed below in section IV.A.2.a., the court finds that

more protective of privacy than Exemption 6' and thus establishes a lower bar for withholding material," *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011) (quoting *U.S. Dep't of Defense v. FLRA*, 510 U.S. 487, 496 n.6 (1994)), "the court need only consider here Defendants' reliance on Exemption 7(C)," *King & Spalding*, *LLP*, 270 F. Supp. 3d at 48 n.2.

Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). There is no dispute here that the information was compiled for law enforcement purposes; the only question is whether release of the information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." To determine whether the release of information constitutes an "unwarranted invasion of personal privacy," the court must balance "the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992); *accord ACLU*, 655 F.3d at 6.

a. The lawyer's name

As to disclosure of the lawyer's name, the balancing under Exemption 7(C) is not as complicated as the parties make it out to be. The D.C. Circuit has long held that "'third parties,' 'witnesses,' and 'informants' mentioned in investigatory files maintain a privacy interest 'in keeping secret the fact that they were subjects of a law enforcement investigation.'" *Bartko*, 898 F.3d at 71 (quoting *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995)); *see also Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 666 (D.C. Cir. 2003) (characterizing this privacy interest as "substantial"). For this reason, the Circuit has adopted a

Plaintiff has failed to meet that burden here. Thus, the court will grant summary judgment in favor of Defendants as to the withholding of the names and identifying information of these individuals as well.

"categorical rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" *Schrecker*, 349 F.3d at 661 (quoting *SafeCard Servs.*, 926 F.2d at 1206); *accord Bartko*, 898 F.3d at 71; *see also Prop. of People v. U.S. Dep't of Justice*, 310 F. Supp. 3d 57, 68 (D.D.C. 2018) ("[T]he D.C. Circuit has held that any 'names and identifying information of third parties contained in . . . investigative files are presumptively exempt.'" (quoting *CREW*, 746 F.3d at 1096)).

Because Plaintiff has not come forward with "compelling evidence" that would confirm or refute allegations of illegal agency activity, Plaintiff cannot overcome application of the categorical rule in this case.  Even outside the categorical rule context, when a requester suggests wrongdoing, she "must establish more than a bare suspicion in order to obtain disclosure." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) ("[W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure.").  "Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Id.*  Courts "must insist on a meaningful evidentiary showing," the Supreme Court has explained, because "[a]llegations of government misconduct are easy to allege and hard to disprove." *Id.* at 175 (internal quotation marks omitted).

Here, Plaintiff contends that there is enough evidence to warrant a reasonable belief "that the government disclosed confidential information about the investigation to Maquet, one of Abiomed's main competitors, or a closely-associated individual." Pl.'s Initial Reply at 8.  To support this contention, Plaintiff first points to a Forbes.com article reporting that "the

investigation of Abiomed was 'rumored' on Wall Street for at least two weeks" before the USAO-DC issued a grand jury subpoena to Abiomed on October 26, 2012. Pl.'s Cross-Mot. at 32; Pl.'s Stmt. ¶ 40; *see* Pl.'s Cross-Mot., Decl. of John C. Richter, ECF No. 21-1 [hereinafter Richter Decl.], ¶¶ 25–26; *see also* Richter Decl., Attach. Q (Forbes article). Because "only the government knew what it was going to do," Plaintiff posits, "it is not unreasonable to suspect that the government was the source of that rumor." Pl.'s Cross-Mot. at 32; *accord* Pl.'s Initial Reply at 8–9.

Plaintiff further asserts that its suspicion that "someone in the government who knew about the subpoena leaked information about the status of the investigation to Maquet, who then leaked it to investors," Pl.'s Initial Reply at 9, is corroborated by the following evidence: (1) a February 2014 meeting in which a former Maquet executive told Abiomed executives that he "personally participated in a plan, generated by two Maquet employees, to hire an out-of-state law firm to submit complaints against Abiomed to the [DOJ] in hopes of sparking a government investigation," Pl.'s Initial Reply, Ex. A, Decl. of Sean C. Flynn, ECF No. 27-1, ¶ 3; (2) an April 2014 meeting in which a Maquet marketing manager told Elliot Favus, an investment analyst, that Maquet was voluntarily providing federal investigators with information about regulatory violations by Abiomed, *see* Pl.'s Initial Reply, Ex. B., Decl. of Bryan J. Finley, ECF No. 27-2 [hereinafter Finley Decl.], ¶ 5; *see also* Finley Decl., Ex. B; (3) a statement by one of Maquet's marketing managers to Abiomed's regional directors that Abiomed had "some big news coming" and was in for a "big surprise" at a conference in late October 2012, just days before the USAO-DC issued the grand jury subpoena to Abiomed, Finley Decl. ¶ 2; (4) a meeting that occurred between a Maquet marketing manager and Favus at the same October 2012 conference, which included a discussion of Abiomed, *see id.* ¶¶ 3–4; *see also* Finley Decl., Ex. A; and (5) the fact

that the "outstanding short position on Abiomed's stock mysteriously increased to 395 percent right before the subpoena" issued, Pl.'s Initial Reply at 9 (citing Richter Decl. ¶¶ 25, 27).[8]

Finally, Plaintiff contends that the "abrupt and swift action taken by the [USAO-DC] after these events further suggests the possibility of government impropriety." Pl.'s Initial Reply at 10. Plaintiff cites an April 2, 2014, letter from Abiomed to the U.S. Attorney's Office for the District of Massachusetts, copying the USAO-DC, which "raised concerns about suspected leaks of information about the investigation, potential collusion between analysts and hedge funds who may have been 'front running' Abiomed stock[,] and requested that the government open an investigation into potential securities law violations." Pl.'s Cross-Mot. at 32 (citing Pl.'s Stmt. ¶ 42); *see also* Richter Decl. ¶ 28. Although Plaintiff does not attach the letter, Plaintiff asserts the letter also stated that Abiomed had evidence indicating that "analysts may have obtained the information about the impending subpoenas from Maquet," which, in turn, suggested that "Maquet . . . may have gotten its inside information about the investigation from a government attorney who was handling the investigation." Richter Decl. ¶ 29. Plaintiff emphasizes that "[n]ot long after sending the letter, on or about the middle of May 2014," *id*. ¶ 30, "the lead criminal AUSA in DC was removed from the Abiomed investigation and reassigned," Pl.'s Cross-Mot. at 33 (citing Pl.'s Stmt. ¶ 44).

Though Plaintiff creatively weaves together a host of disparate facts to paint a portrait of government wrongdoing, none of its evidence "warrant[s] a belief by a reasonable person that the alleged Government impropriety might have occurred." *See Favish*, 541 U.S. at 174. Like the

---

[8] In response to Defendants' suggestion that *Plaintiff* might have been the source of the rumor, *see* Defs.' Initial Reply at 15, Plaintiff also offered evidence to foreclose that theory, *see* Pl.'s Initial Reply at 10–11; *see also* Pl.'s Initial Reply, Ex. C, Suppl. Decl. of John C. Richter, ECF No. 27-3, ¶¶ 5–6 (stating that Plaintiff was not aware of the investigation prior to being contacting by Abiomed on October 26, 2012, the day the grand jury subpoena was served, and therefore could not have disclosed information about the investigation or the grand jury subpoena before the subpoena was issued).

requester's efforts in *Blackwell v. FBI*, Plaintiff's recounting of "a litany of allegedly suspicious circumstances" lacks any substantiation and thus "fail[s] to meet the demanding *Favish* standard." 646 F.3d 37, 41 (D.C. Cir. 2011). Plaintiff's "evidence" does not directly implicate a law enforcement official in any unlawful act. And, its circumstantial evidence is similarly lacking: simply put, conjecture of wrongdoing is not the "meaningful evidentiary showing" that *Favish* demands. *See Favish*, 541 U.S. at 175. Absent any hard evidence substantiating its "if not the government then who?" theory, Plaintiff cannot establish that a reasonable person would have more than a suspicion of impropriety. As a result, "there is no 'counterweight on the FOIA scale for the court to balance against the cognizable privacy interest in the requested records." *Boyd v. Criminal Div. of U.S. Dep't of Justice*, 475 F.3d 381, 388 (D.C. Cir. 2007) (quoting *Favish*, 541 U.S. at 174–75). Plaintiff's challenge to Defendants' invocation of Exemption 7(C) as to the lawyer's name therefore must fail.

b. The name of the law firm

That leaves the question whether Defendants also may withhold the identity of the private law firm with which the attorney was affiliated. Defendants urge the court to answer that question in the affirmative, claiming that "employment information" is properly withheld under Exemption 7(C) "when its disclosure would risk identifying the individual whose privacy rights are implicated." Defs.' Combined Opp'n & Reply Mem., ECF No. 35, at 7. Notably, Defendants do not contend that the law firm itself has a privacy interest. Plaintiff, on the other hand, asserts that Defendants have "produced no evidence to support [their] assertion that the name of the law firm would identify the individual attorney." Pl.'s Reply at 9.

The court agrees with Plaintiff. The declarations offered by Defendants largely focus on EOUSA's justification for withholding certain responsive records in full to protect the identity of

the *source*. *See generally* Francis Decl.; Second Francis Decl. They are silent, however, on the question whether disclosing the name of the law firm could reasonably be expected to lead to the disclosure of the identity of the *lawyer*, whose privacy interests are directly at stake. If the law firm is a sole proprietorship, for example, then the court could easily conclude that Defendants properly withheld the name of the firm under Exemption 7(C); in that case, disclosure of the name of the law firm would effectively disclose the identity of the lawyer. If, on the other hand, the law firm is much larger—for example, comprised of hundreds of attorneys—then the court may be less likely to uphold the withholding of the firm name under Exemption 7(C). The record in its present state does not contain such information.

Accordingly, the court will allow Defendants an opportunity to supplement the Francis Declarations with facts that support their assertion that disclosure of the law firm's name could reasonably be expected to constitute an unwarranted invasion of the lawyer's personal privacy.[9]

**B.      Segregability**

Because "[t]he focus of FOIA is information, not documents, . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). FOIA therefore requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b).

Given the court's holding that Defendants must produce the 67 pages of responsive information subject to the Exemption 7(C) redactions outlined above, Plaintiff's challenge to EOUSA's segregability analysis as to those documents *in their entirety*, *see* Pl.'s Cross-Mot. at

---

[9] In addition to filing a supplemental declaration, Defendants may also submit an ex parte, in camera declaration from the lawyer, indicating why disclosure of the name of his or her law firm could reasonably be expected to reveal the lawyer's identity.

38–40; Pl.'s Initial Reply at 12–13, is moot. Furthermore, there is no separate segregability analysis for the court to undertake with respect to these 67 pages because the only material Defendants seek to redact are names and identifying information, as described above.

Finally, although Plaintiff does not challenge EOUSA's segregability determination with respect to the 33 partially redacted pages produced as part of the agency's *supplemental* release, *cf.* Pl.'s Initial Reply at 13, the court still must determine whether EOUSA has carried out its duty to disclose reasonably segregable material, *see Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 287 F. Supp. 3d 50, 74 (D.D.C. 2018) ("A district court must evaluate segregability even where, as here, the requester has not challenged it." (citing *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007)). After reviewing the Francis Declarations, the accompanying Kotler Declaration, and the EOUSA *Vaughn* Index, the court is satisfied that EOUSA has provided a sufficiently detailed justification for its segregability determination with respect to the supplemental release (i.e., documents 13–16). *See* Francis Decl. ¶¶ 14–17; Second Francis Decl. ¶¶ 10–11; Kotler Decl.; EOUSA *Vaughn* Index at 23–26; *see also Sussman*, 494 F.3d at 1117 ("Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material.").

## C.     Exhaustion of Civil Division Request

The court need not linger over the parties' dispute regarding whether Plaintiff failed to exhaust its administrative remedies with respect to the Civil Division request. As Plaintiff correctly points out, this issue may prove to be "meaningless," Pl.'s Initial Reply at 15, because Defendants claim that of the 67 pages withheld in full by EOUSA, the 16 pages responsive to the Civil Division request were duplicative of the other 51 pages responsive to the EOUSA request, *see* Defs.' Stmt. ¶ 15. And, there is no dispute that Plaintiff administratively exhausted its

remedies with respect to the EOUSA request. *See* Defs.' Mot. at 17 ("EOUSA did not provide a final response to Plaintiff prior to the filing of this lawsuit and, therefore, exhaustion is not an issue pertaining to that distinct request."). Plaintiff also notes, however, that Defendants may have located and ultimately withheld *additional* documents responsive to the Civil Division request "due to a perceived failure to exhaust." Pl.'s Initial Reply at 15. Defendants have provided no clarification on this point. *See, e.g.*, JSR ¶ 11; *see also* Defs.' Renewed Mot. at 4 (simply incorporating previous argument that Plaintiff failed to administratively exhaust Civil Division request). For this reason, as directed below, the parties shall clarify whether Defendants have withheld any information in addition to the 16 pages responsive to the Civil Division request discussed above and, if so, whether Plaintiff still intends to challenge the withholding of any documents responsive to the Civil Division request.

### D. Adequacy of Search

Finally, the court addresses Plaintiff's challenge to the adequacy of EOUSA's search for responsive records. *See generally* Pl.'s Cross-Mot. at 41–44. To prevail in a FOIA action, an agency must "demonstrate that it has made 'a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" *Sea Shepherd I*, 89 F. Supp. 3d at 89–90 (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). An agency is entitled to summary judgment "only if it 'show[s] beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents.'" *Aguiar v. Drug Enf't Admin.*, 865 F.3d 730, 738 (D.C. Cir. 2017) (alteration in original) (quoting *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007)). "To meet that burden, the agency may submit, and [the court] may rely on, 'reasonably detailed affidavit[s], setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials

(if such records exist) were searched.'" *Id.* (second alteration in original) (quoting *DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015)). "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Bartko*, 898 F.3d at 74 (internal quotation marks omitted). Summary judgment is inappropriate, however, if "a review of the record raises substantial doubt as to the search's adequacy, particularly in view of well[-]defined requests and positive indications of overlooked materials." *Reporters Comm. for Freedom of Press*, 877 F.3d at 402 (internal quotation marks omitted).

Here, Defendants offer the declaration of Theresa Jones, the acting FOIA coordinator for USAO-DC's Civil Division, to describe the search EOUSA undertook to locate records responsive to Plaintiff's FOIA request. *See generally* Defs.' Mot., Decl. of Theresa D. Jones, ECF No. 20-3 [hereinafter Jones Decl.]; Defs.' Initial Reply, Suppl. Decl. of Theresa D. Jones, ECF No. 25-3 [Suppl. Jones Decl.]. According to Jones, Marvin Bryan, Jr., the FOIA Coordinator for the USAO-DC at the time, began by performing a search of the "Master Index"—the U.S. Attorney's Office computerized docketing/case management system—using the search term "Abiomed, Inc." and a date range of January 1, 2012, to October 31, 2012. Jones Decl. ¶¶ 5, 7. Although this search produced no responsive records, *id.* ¶ 7, Bryan also sent a global email to "all USAO[-]DC Civil Employees in search of responsive records" and "subsequently contacted another AUSA in the Criminal Division after being advised that this AUSA might have potentially responsive records," *id.* ¶ 8. In response to the email, Bryan received two Abiomed-related files from two AUSAs. *Id.* ¶ 9; *see* Suppl. Jones Decl. ¶ 4. For ease of reference, the court refers to these files as Matter One and Matter Two.

Records relating to Matter One were deemed unresponsive, as they post-dated the applicable date range listed in Plaintiff's FOIA request. Jones Decl. ¶ 9; *see also* Suppl. Jones Decl. ¶ 4 (noting that Jones reviewed the paper file associated with one of the two Abiomed-related matters and determined that it fell outside of the relevant date range). Notwithstanding the unresponsiveness of these records, Jones directed the USAO-DC's Information Technology Unit ("IT") to perform an additional search of the electronic files of the only AUSA identified as having been assigned to Matter One. *See* Suppl. Jones Decl. ¶ 4; Jones Decl. ¶ 13. Although the AUSA no longer worked in the office at the time of the search, IT was able to search a copy of the AUSA's email mailbox "as it existed on the day IT removed it from the network." Suppl. Jones Decl. ¶ 4; *see also* Jones Decl. ¶ 13 (noting that USAO-DC's "email archive platform contains three years' worth of data for employees, and IT removes an employee's network account from the system after an employee resigns"). Jones asked IT to perform a search using the terms "Abiomed, Inc.," "Food & Drug Administration," "Department of Justice Consumer Protection Branch," and the name of the source's lawyer's law firm—all subject to the timeframe of January 1, 2012, to October 31, 2012. Jones Decl. ¶ 14. After running a search for the applicable date range using the abovementioned search terms and variants thereof, IT located 420 documents. *Id.* ¶ 15. Jones's review of those documents, however, yielded no responsive records. *Id.* ¶ 17.

The file concerning Matter Two was found in the Fraud and Public Corruption Section ("FPS") of the USAO-DC's Criminal Division. Jones Decl. ¶ 10. An AUSA in FPS, who had been assigned to Matter Two more recently, i.e., outside the relevant time period, provided the file to Jones for review, and that file ultimately was determined to have some documents responsive to Plaintiff's FOIA Request. *See* Jones Decl. ¶ 10; Suppl. Jones Decl. ¶ 5. This AUSA further assisted in Jones's search effort by (1) facilitating access to FPS's electronic files stored on a

secured network drive, which Jones searched for responsive records related to Abiomed, Inc., and (2) searching a ".pst folder" that the AUSA maintained in connection with his work on the Abiomed matter for any emails that fell within the applicable date range.  *See* Jones Decl. ¶¶ 11–12; Suppl. Jones Decl. ¶ 5.  Jones's search of FPS's electronic files yielded no responsive records. Jones Decl. ¶ 11.  It is unclear whether the AUSA's search of his .pst folder yielded any responsive records.  *See id.* ¶ 12 (stating only that the AUSA from FPS "provided the result of [his] review" to Jones and not specifying whether this search effort, as opposed to a separate search effort also described, yielded responsive records).

In addition to the above-described efforts, Jones also determined that two other AUSAs were assigned to Matter Two during the relevant time period.  Suppl. Jones Decl. ¶ 5.  Only one of those AUSAs still worked in the U.S. Attorney's Office as of Jones's search; the other left the office in May 2014.  *Id.* ¶ 6.  "The AUSA who was still in the office searched his [own] files, including emails, for responsive documents and provided potentially responsive documents to [Jones]."  *Id.*  Jones located some responsive documents as a result of that review.  *See id.*; Jones Decl. ¶ 12.

Jones did not at first conduct a search of the emails of the AUSA who left the office in May 2014 due to "a misunderstanding as to whether that [AUSA's] electronic files could still be accessed."  Suppl. Jones Decl. ¶ 6.  However, after further inquiry, Jones learned that a convenience copy of the AUSA's email mailbox remained available, "as it [existed] the day IT removed the AUSA's account from the network."  *Id.* ¶ 7; *see id.* ¶ 6; *see also* Jones Decl. ¶ 13 (explaining that IT removes an employee's network account from the system after an employee resigns).  Jones then obtained a convenience copy from IT and personally searched the AUSA's

mailbox for responsive documents. Suppl. Jones Decl. ¶ 7. Jones located four responsive documents as a result of this supplemental search. *Id.*

To summarize, as to email searches, "the identified AUSAs who were still in the office searched their own email for responsive documents and, for AUSAs who no longer were in the office, that email was searched as it existed at the time those AUSAs left the office." *Id.* ¶ 8. Jones explains that "[t]he only other potential source for email would be email retained by EOUSA in its USAMail archive." *Id.* ¶ 9. That archive "is automatically purged on a three-year sliding timeline, meaning that email only can be accessed dated back to three years from the date of the search." *Id.* Because the searches were performed in 2016 and 2017, respectively, the relevant time period in Plaintiff's FOIA request (January 1, 2012, to October 31, 2012) fell outside that three-year window. *Id.* Thus, the USAMail archive "was not searched because it would not contain responsive documents." *Id.* Furthermore, according to Jones, there are not any backup tapes or other archives where responsive records might be housed. *See id.* (noting that the only backup tapes used within USAMail are for disaster recovery, which retain only the previous seven days of exchange database data); *id.* ("EOUSA does not maintain archived backup tapes.").

Plaintiff's challenge to the adequacy of EOUSA's search focuses on the search of emails. In Plaintiff's view, Jones's description of that search is deficient in three respects. First, Plaintiff contends that although Jones searched a convenience copy of the mailbox of the former AUSA who was previously assigned to Matter Two (i.e., the matter falling within the relevant time period) as part of her supplemental search, Jones's supplemental declaration does not identify the search terms used to search that AUSA's mailbox or explain how the search was conducted. *See* Pl.'s Initial Reply at 15–16. While Jones describes in some detail the search conducted by IT of the *other* former AUSA's email—the one assigned to Matter One—Plaintiff submits that she does not

do the same for the email of the departed AUSA assigned to Matter Two. *See id.* at 16. Second, Plaintiff asserts that Jones's explanation with respect to the two current AUSAs assigned to Matter Two who searched their own email mailboxes suffers from the same deficiencies—namely, the failure to provide any information about the search terms or methods the AUSAs used. *Id.* Third, and relatedly, Plaintiff complains that Jones does not sufficiently describe the *scope* of the search conducted by the two AUSAs who searched their own emails. *See id.* at 16–17. For example, Plaintiff points out that while Jones states that the current AUSA who worked on Matter Two during the relevant time period searched his files, "including emails," Jones does not explain whether this search included the AUSA's current inbox and all relevant folders. *Id.* at 17. Similarly, Plaintiff notes that while Jones clarifies in her supplemental declaration that the AUSA in FPS who was assigned to Matter Two more recently searched a ".pst folder" as opposed to an "archive folder," Jones still "does not state whether that AUSA searched any email outside this folder and, if not, whether those other places were likely to contain responsive information." *Id.*

At least with respect to the methods used and the locations searched, the court is satisfied that Jones has provided a sufficiently detailed description of the agency's search efforts. The court, however, agrees with Plaintiff that Jones's declarations are lacking insofar as they do not include the search terms used to search three of the four AUSAs' email files. For Defendants to carry their burden of demonstrating the adequacy of the search, the declarations they rely upon "must set forth '*the* search terms' used in the search, not *some* of the search terms used.'" *Walston v. U.S. Dep't of Defense*, 238 F. Supp. 3d 57, 65 (D.D.C. 2017) (quoting *Oglesby*, 920 F.2d at 68). Here, while Jones sets forth the search terms used by IT in conducting a search of one former AUSA's email, Jones does not state whether similar terms were used when she conducted her own search of another former AUSA's email. Nor does Jones indicate what search terms were used by the current

AUSAs who searched their own emails. Thus, the court will deny the parties' renewed cross-motions for summary judgment without prejudice as to the adequacy of the search and allow Defendants an opportunity to either (1) submit an additional declaration from Jones attesting to the search terms used in the original searches described above, or (2) conduct a new search for the requested records and provide a sufficiently detailed declaration, which includes a description of the search terms used, in support of that renewed search effort.

## V.  CONCLUSION AND ORDER

For the reasons stated above, Defendants' Renewed Motion for Summary Judgment, ECF No. 32, and Plaintiff's Renewed Cross-Motion for Summary Judgment, ECF No. 33, are granted in part and denied in part. To recap the court's rulings:

1.  Judgment is entered in favor of Plaintiff with respect to the 67 pages withheld in full under Exemption 7(D).

2.  Judgment is entered in favor of Defendants with respect to appropriate redactions under Exemption 7(C) within the 67 pages withheld in full and the 33 pages released in part, including the source's lawyer's name.

3.  On or before October 9, 2018, Defendants may file any supplemental declaration(s) as to the following:

a.  The agency's justification under Exemption 7(C) for withholding the name of the source's lawyer's law firm; and

b.  The adequacy of EOUSA's search to include, at least, the relevant search terms used to locate responsive emails for three of the four AUSAs.

4.  Finally, no later than October 22, 2018, the parties shall file a Joint Status Report that addresses (a) whether Plaintiff intends to challenge Defendants' withholdings under

Exemptions 4 and 5; (b) whether there are any remaining issues with respect to the Civil Division request; and (c) whether the parties intend to renew their motions for summary judgment with respect to any disputes concerning disclosure of the law firm's name or the adequacy of EOUSA's search.  If the parties intend on further litigation, they shall propose a briefing schedule.

Dated:  September 7, 2018

Amit P. Mehta
United States District Judge